T.C. Memo. 2012-126

UNITED STATES TAX COURT

LOREN DUNLAP AND NANCY DUNLAP, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos.  28849-08, 10393-09,        Filed May 1, 2012.
             12168-09, 14860-09,
             14865-09, 14866-09,
             20138-09.

Frank Agostino, Kathleen Pakenham, and David L. Evans, for petitioners.

Marc Lee Caine, Alex Shlivko, James P.A. Caligure, Marissa J. Savit, and Nancy J. Lee, for respondent.

---

[1]Cases of the following petitioners are consolidated herewith:  Roy Zeluck, docket No. 10393-09; Christopher and Claire Baldwin Smith, docket No. 12168-09; Jan P. Marks, docket No. 14860-09; Donna Weinheim, docket No. 14865-09; Susan G. Anderson and Rick B. Honey, docket No. 14866-09; and Thomas Rukan and Alexandra Wheeler, docket No. 20138-09.

## MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge: These cases involve charitable contribution deductions claimed as the result of a historic preservation easement (facade easement) contribution. Respondent determined the following income tax deficiencies and additions to tax with respect to petitioners in these consolidated cases:

Loren and Nancy Dunlap, docket No. 28849-08:

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------------------|
| 2003 | $42,154 | $8,431 |
| 2004 | 46,098 | 9,220 |

Roy Zeluck, docket No. 10393-09:

| | | Penalties | |
|------|-----------|-------------|-------------|
| Year | Deficiency | Sec. 6662(h) | Sec. 6662(a) |
| 2003 | $135,100 | $25,200 | $14,420 |

Christopher and Claire Baldwin Smith, docket No. 12168-09:

| Year | Deficiency | Penalty Sec. 6662(h) |
|------|-----------|----------------------|
| 2003 | $15,025 | $6,010 |
| 2004 | 24,077 | 8,266 |
| 2005 | 3,403 | 1,361 |

Jan P. Marks, docket No. 14860-09:

| Year | Deficiency | Penalty Sec. 6662(h) |
|------|-----------|----------------------|
| 2003 | $44,311 | $17,724 |
| 2004 | 22,188 | 6,873 |

Donna Weinheim, docket No. 14865-09:

| | | Penalties | |
|------|-----------|-----------|-----------|
| Year | Deficiency | Sec. 6662(h) | Sec. 6662(a) |
| 2003 | $50,119 | $20,048 | -0- |
| 2004 | 4,710 | -0- | $718 |

Susan G. Anderson and Rick B. Honey, docket No. 14866-09:

| Year | Deficiency | Penalty Sec. 6662(h) |
|------|-----------|----------------------|
| 2003 | $29,436 | $11,774 |

Thomas Rukan and Alexandra Wheeler, docket No. 20138-09:

| | | Penalties | |
|------|-----------|-----------|-----------|
| Year | Deficiency | Sec. 6662(h) | Sec. 6662(a) |
| 2003 | $66,686 | $1,700 | $11,130 |
| 2004 | 102,470 | 6,950 | 17,019 |
| 2005 | 25,621 | 10,248 | -0- |

After concessions,[2] the issues for decision are:

(1) whether petitioners are entitled to charitable contribution deductions under section 170[3] resulting from the donation of a facade easement on their condominium building to the National Architectural Trust (NAT). We hold that they are not;

(2) whether cash contributions made by petitioners Loren and Nancy Dunlap (Dunlaps), Christopher and Claire Baldwin Smith (Smiths), and Thomas Rukan and Alexandra Wheeler (Rukan/Wheeler) to NAT are deductible as charitable contributions under section 170. We hold the cash contributions are deductible; and

(3) whether petitioners are liable for the accuracy-related penalties under section 6662(a) and (h). We hold they are not.

---

[2]Respondent concedes all penalties determined against petitioner Jan P. Marks. Petitioners Thomas Rukan and Alexandra Wheeler conceded the deduction for a cash payment to National Architectural Trust of $19,734 for tax year 2003 but now seek to claim the deduction for 2004.

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

The Dunlaps, the Smiths, and Roy Zeluck resided in New York, New York, at the time their petitions were filed.  Jan P. Marks resided in Las Vegas, Nevada, at the time his petition was filed.  Donna Weinheim resided in Southampton, New York, at the time her petition was filed.  Susan G. Anderson and Rick B. Honey (Anderson/Honey) resided in Weston, Connecticut, at the time their petition was filed.  Rukan/Wheeler resided in Brooklyn, New York, at the time their petition was filed.

1.  Cobblestone and Related Parties

The Cobblestone Loft Condominium (Cobblestone) is a seven-story loft building in the Tribeca North Historic District of New York, New York.  Cobblestone is made up of 31 units including two penthouses and 1 unit owned by Cobblestone for use by the superintendent.  Cobblestone also has 14 parking spaces.  All petitioners owned units within Cobblestone during 2003.  The Cobblestone board of managers (Cobblestone board) has general oversight over the property and consists of five people who are elected at an annual meeting.

The owner of each unit or parking space in Cobblestone also holds an ownership interest in the common elements of Cobblestone (totaling 100% of the common elements among all units and parking spaces).  The ownership interests in

the common elements vary with the individual units (as well as the parking spaces). The Declaration of Condominium defines the common elements as "the Property including the Land and all parts of the Building and improvements thereon other than the Units." The Cobblestone bylaws require unit owners to seek approval from the Cobblestone Board before making changes to Cobblestone's common elements.

Andrews Building Corp. (ABC) is the building management company hired by the Cobblestone Board to manage the property. For handling the day-to-day operations of Cobblestone, ABC received approximately $2,700 to $3,700 a month from Cobblestone.

Steven McGrath was the treasurer of the Cobblestone Board. Mr. McGrath's responsibilities as treasurer included preparing the annual budget, reviewing all monthly expenses, and dealing with any mechanical issues.

2. The Facade Easement Donation

A. Introduction

NAT is a section 501(c)(3) charitable organization formed in 2001 which holds over 800 preservation easements on buildings across the country, including over 500 in New York City. NAT was introduced to the Cobblestone Board by ABC. ABC explained to the Cobblestone Board that NAT was interested in holding

facade easements that would preserve the character of the neighborhood and that donors could participate in the Federal Historic Preservation Tax Incentive Program (program), qualifying them for tax deductions if they donated a facade easement on Cobblestone. The Cobblestone Board did a preliminary review of NAT materials distributed by ABC and then met with Daniel Reardon. The Cobblestone Board was told that Mr. Reardon was a NAT employee, but he actually worked for a related entity, as described below.

On May 22, 2003, Mr. Reardon made a presentation to the Cobblestone Board concerning the possibility of Cobblestone's participating in the program. He explained the need to complete a qualified appraisal of Cobblestone. ABC recommended that the Cobblestone Board have the program reviewed by a tax attorney.

NAT introduced Mr. McGrath to the law firm Herrick, Feinstein LLP (Herrick Feinstein). Herrick Feinstein had previously done paid legal work for NAT in connection with other facade easement donations. Mr. McGrath and other board members asked various people about Herrick Feinstein, including Mr. McGrath's personal accountant and the Cobblestone board's attorney, Aaron Shmulewitz.

ABC issued a letter to all unit owners with information about the program. The letter stated that by granting a facade easement, each unit owner would be entitled to a tax deduction of 10% to 15% of the value of the unit. The letter also stated that the Cobblestone board had been in contact with an experienced law firm concerning the facade easement donation and related tax benefits.

The Cobblestone board decided to retain Herrick Feinstein and had Mr. Shmulewitz review and negotiate Herrick Feinstein's engagement. Herrick Feinstein's engagement letter to the Cobblestone board (made out to the attention of Mr. McGrath) contained a statement that Herrick Feinstein also represented NAT in connection with answering questions of prospective grantors. Mr. McGrath signed the letter on November 2, 2003, and in doing so, waived any possible conflicts. The Cobblestone board agreed to pay $90,000 plus disbursements for Herrick Feinstein's representation. ABC distributed information packages to all unit owners advising them of Herrick Feinstein's representation and providing them with additional information concerning the tax deduction.

Dennis Russo was a partner in Herrick Feinstein's real estate department and the contact attorney at Herrick Feinstein for the Cobblestone board. At an October 10, 2003, Cobblestone board meeting Mr. Russo explained the facade easement

donation process and made certain recommendations. The Cobblestone board agreed to draft a letter to the unit owners, to be reviewed by Mr. Russo, setting forth the steps necessary to effect the facade easement donation and a timeline of events. It was also agreed that Mr. Russo would be available to discuss the facade easement donation with tax advisers of unit owners, although it was not established that he did so.

At some point Herrick Feinstein provided the Cobblestone board with an opinion letter which concluded that the facade easement donation constituted a qualified conservation contribution which could be deducted pro rata by each unit owner. While the letter was dated "As of December 31, 2003" a footnote in the letter references a document not released until July 2004. The letter is written on Mr. Russo's letterhead, but it does not contain his signature. Instead the opinion letter is signed "Herrick, Feinstein". The opinion letter was distributed to each unit owner at an unknown time.

Mr. McGrath had previously worked with Miller Samuel, Inc. (Miller Samuel), an appraisal firm established in 1986. Jonathan Miller was the president, chief executive officer, and cofounder of Miller Samuel. He is also a cofounder and managing principal of Miller Cicero, LLC, which provides commercial real estate valuation services. Mr. Miller is a licensed real estate appraiser in New York.

In February 2004 Miller Samuel sent a proposal letter to Mr. McGrath concerning the possibility of engaging Miller Samuel to prepare an appraisal for the facade donation. Before sending the proposal letter, Miller Samuel had been in contact with Mr. Reardon and Herrick Feinstein about Cobblestone's need for an appraisal. Miller Samuel sent the proposal letter to Mr. McGrath at the request of Mr. Reardon. NAT's referral of Miller Samuel to Cobblestone had either no value, or an insignificant value to the Cobblestone unit owners.

Several other members of the Cobblestone board knew of Miller Samuel and felt Miller Samuel would be able to properly prepare the appraisal. The Cobblestone board decided to retain Miller Samuel, and Herrick Feinstein reviewed the Miller Samuel engagement letter. The unit owners paid Miller Samuel's appraisal fee of approximately $9,300. NAT did not make any payment to Miller Samuel in connection with the Cobblestone facade easement donation.

NAT provided certain minor administrative work necessary to the facade easement donation, including baseline documentation on Cobblestone's application with the U.S. Department of the Interior, National Park Service (NPS), and assisting with the recording of the easement deed. This administrative work was done so that NAT would be assured of holding an enforceable facade easement in perpetuity.

Any benefits accruing to unit owners as a result of such work were incidental and insignificant.

### B. The Facade Easement Donation and Easement Deed

On September 29, 2003, the Cobblestone board executed an application to the NPS to certify Cobblestone as a historic structure. Herrick Feinstein facilitated the certification. In December 2003 the NPS certified that Cobblestone contributes to the significance of the Tribeca North Historic District and is a "certified historic structure" for charitable contribution and conservation purposes in accordance with the Tax Treatment Extension Act of 1980.

On December 16, 2003, the Cobblestone board held a meeting during which Mr. Russo informed the Cobblestone board that the facade easement deed was complete and that it needed to be executed before December 31, 2003, for the unit owners to be able to claim tax deductions from the facade easement donation for 2003. The Cobblestone board reviewed the deed and voted unanimously to execute it.

Mr. McGrath executed the facade easement deed as treasurer of the Cobblestone board on or about December 23, 2003. The deed was accepted by NAT and delivered to the New York City Department of Finance Office of the City Register on December 29, 2003.

The facade easement deed was an agreement between NAT and the Cobblestone board which donated a scenic, open space and an architectural facade conservation easement to NAT. The facade easement deed restricts the Cobblestone board's ability to undertake any alteration, construction, or remodeling of Cobblestone's facade without the express written consent of NAT. The Cobblestone board also agreed that any rehabilitation work or new construction work on the facade, whether or not NAT consented to the work, would comply with the requirements of all applicable Federal, State, and local laws and regulations.

C. Mr. Miller's Appraisal

Mr. Miller of Miller Samuel appraised the Cobblestone facade easement. Mr. Miller completed the appraisal on March 14, 2004, after inspecting both the interior and exterior of Cobblestone. On March 22, 2004, Mr. Miller supplemented the appraisal and annexed a copy of the executed facade easement deed to the appraisal.[4] Mr. Miller's appraisal:

(1) identified the address, block, and lot number of Cobblestone;

---

[4]The supplement was executed to correct the assignment of parking space 8 to unit 6E rather than unit 4A and to clarify that the appraisal was based on the facade easement deed. It also included an addendum to the appraisal that corrected any errors due to the wrongful assignment of parking space 8.

(2) contained a description of Cobblestone's neighborhood, site, and zoning designation;

(3) contained a discussion of historic facade conservation easements;

(4) included floor plans and photographs of Cobblestone and an appraisal of each individual unit as a percentage of Cobblestone's fair market value;

(5) explained the agreement between NAT and petitioners concerning the use of the property after the facade easement donation;

(6) included the name and address of Mr. Miller;

(7) included Mr. Miller's New York license number;

(8) stated that the date of the valuation was "as of" December 28, 2003;

(9) defined market value as "The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.";

(10) stated that the fair market value of the facade easement as of December 28, 2003, was $8,171,000, or 12% of the appraised value of Cobblestone before the easement of $68,095,000;

(11) included a table apportioning that value to each of the individual units;

(12) provided an estimate of Cobblestone's value both before and after the facade easement and determined the value of the facade easement according to the amount by which the value of Cobblestone was diminished;

(13) completed the Uniform Standards of Professional Appraisal Practice;

(14) discussed the cost, income, and market data analysis valuation approaches and determined that the cost approach and the income approach were not reliable in the appraisal of individual condominium units in the subject market;

(15) stated that the market data analysis approach would best reflect current market conditions, based on the sale prices of actual transactions;

(16) compared similar properties that were transferred close to the valuation date;

(17) considered the restrictions imposed by the New York City Landmarks Preservation Commission and determined that the facade easement was more onerous;

(18) recognized that in the future, as real estate market participants gain awareness of historic preservation easements, a loss in value could be more readily abstracted and thereby reflected in transaction prices;

(19) recognized that when transaction data becomes available the change in real estate values to reflect this difference in property rights may or may not be consistent with published IRS guidance (referred to in the appraisal as the Primoli letter, a document on the NPS and IRS Web sites written by IRS employee Mark Primoli. The Primoli letter, before being revised, stated: "Internal Revenue Service Engineers have concluded that the proper valuation of an Facade easement should range from approximately 10% to 15% of the value of the property." This letter was sent to unit owners in one of their information packages.);

(20) discussed several Tax Court cases in which valuation of a facade easement was in dispute;

(21) described the market conditions around the time of the valuation's effective date; and

(22) concluded that a 12% reduction in Cobblestone's value as a result of the facade easement donation was appropriate when considering the restrictions already in place as a function of Cobblestone's location in a New York City historic district, the lost opportunity for advertising on the east facade, and the fact that Cobblestone has three street level facades affected by the easement (as opposed to just one or two street-level facades).

Copies of the completed appraisal were given to all unit owners.

3. Springfield Management Services, Cash Contributions, and NAT's Enforcement of the Facade Easement

A. Springfield Management Services

NAT was founded by Jim Kearns and Steve McClain. Springfield Management Services (SMS), a for-profit organization, was also formed by Mr. Kearns and Mr. McClain. Mr. Kearns and Mr. McClain each owned 50% of SMS. In addition to their positions with SMS, Mr. Kearns served as president or copresident of NAT from at least 2003 to 2006, and Mr. McClain served as either a director, copresident, or president of NAT from at least 2003 to 2008. While they were working for NAT they also received compensation from SMS. At least one other officer of NAT was also an employee of and received compensation from SMS.

In addition to NAT employees also employed by SMS, several SMS employees and independent contractors held themselves out as actually working for NAT when they did not. Mr. Reardon was one such SMS independent contractor; although he worked for and was paid by SMS, he was represented to the Cobblestone board as a NAT representative.

SMS had an agreement with NAT to provide services to help NAT establish its facade easement program, including providing educational services to donors, assisting with the NPS donation application (including taking photographs required for the application), preparing easement documents, and fundraising activities. SMS did not monitor the easements held by NAT; only NAT undertook such postdonation activities. SMS received a percentage of donor cash contributions paid to NAT (described further infra). SMS then paid a percentage of the money it received to SMS employees and independent contractors. During 2002 NAT paid $483,456 to SMS. Amounts paid to SMS increased to approximately $5.5 million and $5.8 million, during 2003 and 2004, respectively, but dropped to approximately $2.6 million and $181,154 in 2005 and 2006, respectively.

Herrick Feinstein had previously provided legal services to SMS (in addition to those it provided to NAT). The fact that Herrick Feinstein had previously done

legal work for SMS was not disclosed to the Cobblestone board. Indeed, it appears that the existence of SMS was never disclosed to ABC or anyone at Cobblestone (although Mr. McGrath may have discovered SMS' existence when SMS paid the Cobblestone board $2,000, as described further infra).

NAT terminated its agreement with SMS in December of 2004[5] because of concerns regarding NAT's entanglement with a for-profit entity. SMS dissolved in October 2006. Before and after SMS' dissolution many SMS employees were hired by NAT.

B. Cash Contributions

As a condition of the facade easement donation, unit owners were required to make cash contributions to NAT, purportedly for monitoring and other fees associated with enforcing the facade easement on Cobblestone (described further infra). In its 2003 Historic Preservation Easement Guide, the NPS stated that such "monitoring fees" paid to organizations holding historic preservation easements

---

[5]Although the agreement was terminated in 2004, NAT's tax returns for 2005 and 2006 still reflect significant payments made to SMS as a result of existing obligations NAT had to SMS.

(specifically listing NAT) were deductible as charitable contributions.[6]  NAT enforced the cash contribution by telling unit owners that they would not receive their Forms 8283, Noncash Charitable Contributions (required to claim a deduction for the facade easement donation), until NAT received the cash contributions.

The unit owners all made contributions to NAT equal to 7% of their units' shares of the appraised value of the facade easement donated to NAT.  The contributions were made after the appraisal had been completed and totaled $571,998.  NAT sent letters to the unit owners thanking them for their cash and facade conservation easement contributions.  The letters stated that the unit owners had received no goods or services in return for their contributions and also indicated the amount of each unit owner's cash contribution.

Thirty-five percent of the cash contributions made to NAT by Cobblestone unit owners was paid by NAT to SMS.  Two percent was also paid by NAT to ABC in early 2005 for ABC's administrative work involving the Cobblestone facade easement donation.  At the suggestion of Mr. McGrath, ABC paid half of this 2% into the Cobblestone operating account in recognition of the Cobblestone board's

---

[6]The same guide also advised potential preservation easement donors to "Check with easement holding organizations * * * for [qualified appraiser] recommendations."

administrative work.  In addition, Mr. Reardon offered to pay Mr. McGrath $2,000

for the large amount of work Mr. McGrath had personally performed, but Mr.

McGrath turned the money down.  After Mr. McGrath refused the $2,000, SMS

paid the Cobblestone board $2,000.

C.  NAT's Enforcement of the Facade Easement

From 2001 to 2007 NAT's total expenses were approximately $41,412,

$880,000, $5.8 million, $6.5 million, $3 million, $4.6 million, and $4.2 million,

respectively.  In 2001, the year of its formation, NAT was granted 18 easements and

spent less than $553 on monitoring photography.[7]  In 2002 NAT was granted 68

new easements and spent less than $7,629 on monitoring photography.  In 2003

NAT was granted 234 new easements and spent $900 on monitoring photography

fees.  In 2004 NAT was granted approximately 250 new easements and spent

$13,345 to monitor the easements it held.[8]  By the end of 2005 NAT held over 650

easements and spent $12,113 to monitor them.  By the end of 2006 NAT held over

---

[7]For both 2001 and 2002 NAT combined monitoring photography fees and fees it charged to install plaques at protected properties.  In 2003 NAT began separating the two expenses and in that year spent $15,164 on plaque expenses compared with only $900 spent on monitoring photography.

[8]In 2004 NAT began listing the total amount spent on monitoring, as opposed to just listing the amount spent on monitoring photographs.

750 easements and spent $56,585 to monitor them. By the end of 2007 NAT held over 800 easements and spent $115,884 to monitor them.

NAT's monitoring process purportedly consists of: (1) visiting each property annually and taking photographs to make sure the property was in compliance with the easement; (2) reviewing any requests for alterations made by the property owners; and (3) discussing the easement and its consequences with new owners when an easement property was sold. The property visits are made by NAT employees traveling from Washington, D.C.; their travel costs are included in NAT's monitoring expenses. The property visits involve an inspection and photographing of a property's exterior only; no inspection of the interior is made. NAT evaluates changes to easement properties using standards promulgated by the Secretary of the Interior for historic buildings and has a variety of potential legal options should the terms of one of its easements be violated.

In spite of the extensive easement donation process, Cobblestone was somehow not included in NAT's easement monitoring process until January 2006.[9] Four other easement properties had been similarly overlooked.

---

[9]Respondent claims that NAT did not notice the lack of monitoring of Cobblestone until the IRS began auditing petitioners' tax returns as a result of the facade easement donation. However, no evidence relating to audit dates or the date which NAT learned of the audit was introduced.

D.  The New York City Landmarks Preservation Commission

The New York City Landmarks Preservation Commission (LPC) is the agency responsible for identifying and designating New York City landmarks and buildings in New York City's historic districts.  The LPC also has a set of regulations with which historic buildings must comply.  If a historic property fails to comply with LPC regulations, the LPC has a variety of legal options, including imposition of fines up to $5,000 as well as injunctive relief.  These regulations are slightly different from the Secretary of the Interior's standards used by NAT.[10]  In order for owners of historic properties to make certain changes to their property (including changes to a building's facade, such as adding advertising signage), they must first obtain permission to make the change from the LPC.

The LPC has over 60 staff members performing a variety of duties.  Four of the full-time staff members are dedicated specifically to enforcement of LPC regulations.  While LPC staff do not perform annual monitoring visits of the 26,000 historic properties covered by LPC regulations, staff members do pay visits to or review photographs of properties for a variety of other purposes.  During such visits or reviews staff members may notice a violation of LPC regulations and act on it.  In

---

[10]One such difference is that the LPC regulations permit brick cleaning with water pressure up to 500 pounds per square inch as opposed to the Secretary of Interior's standards which limit water pressure to 400 pounds per square inch.

addition to LPC staff, there are a large number of community groups and preservation activists in contact with the LPC over a thousand times each year regarding potential violations of LPC regulations.

Cobblestone is a historic property subject to LPC regulations. In addition, Cobblestone also has a "sound, first-class condition" designation under LPC regulations. This special designation applied to approximately 150 of the 26,000 properties subject to LPC regulations and results in designated properties' being subject to a higher standard of preservation than the normal LPC standard. The "sound, first-class condition" designation applies to a property in perpetuity. In addition to its special designation, one of petitioners' expert witnesses also stated that Cobblestone entered into a Continuing Maintenance Agreement with the LPC regarding inspections of the property to take place every five years. The Continuing Maintenance Agreement is described further infra.

4. Information About Petitioners

Petitioners each attached a Form 8283 to their 2003 income tax return, reporting: (1) Cobblestone's address and the owners' respective unit numbers; (2) the overall physical condition of the donation being a "Historic Preservation Easement Donation"; (3) their unit's portion of the appraised value of the easement; and (4) that the type of property donated was "real estate". However, petitioners

did not complete portions of the Forms 8283 regarding the donor's cost of or basis in the donated property, the date the donor acquired the property, and how the donor acquired the property. An authorized representative of NAT executed the donee acknowledgment on the Forms 8283, representing that NAT was a qualified organization under section 170(c) and that NAT received the easement on December 29, 2003. Mr. Miller executed the declaration of appraisal included on the Forms 8283, certifying that he was a qualified appraiser and stating the date of appraisal as being December 28, 2003.

Of the cash contributions to NAT, respondent seeks to disallow only those made by the Dunlaps, the Smiths, and Rukan/Wheeler. We therefore do not address any cash contributions made or resulting deductions claimed by the remaining petitioners.

A.  Loren and Nancy Dunlap

The Dunlaps resided in unit 4B, which was owned by Nancy Dunlap's limited liability company, JDC Properties-II, LLC (JDC Properties). JDC Properties acquired the unit on August 8, 2001, as well as a 3.23% undivided interest in the common elements of Cobblestone. Nancy Dunlap has a degree in anthropology and history from the University of Denver. She graduated from St. John's University Law School in 1991 and is a senior adviser and trustee for former New Jersey

Governor John Corzine's trust. JDC Properties is a disregarded entity for Federal tax purposes. The value of unit 4B was approximately $2 million before the facade easement was granted to NAT.

The Dunlaps timely filed their 2003 and 2004 income tax returns on October 15, 2004 and 2005, respectively. On their 2003 return they claimed a noncash charitable contribution deduction of $237,000 for the donation of the facade easement. They deducted $126,670 of the $237,000 for 2003 and carried over and deducted the remaining $110,330 for 2004. The Dunlaps also deducted a cash contribution to NAT of $16,588 on their 2004 tax return.

The Dunlaps' 2003 and 2004 income tax returns were prepared by Theresa Sanford, a return preparer from Faucett, Taylor & Associates, LLP. Neil Faucett had served as Nancy Dunlap's accountant for over 20 years. Nancy Dunlap testified that she sent Mr. Faucett all materials she received relating to the facade easement donation. She further testified that she discussed the facade easement donation deduction with Mr. Faucett and relied on his advice in claiming the deductions.

On September 14, 2008, respondent mailed a notice of deficiency to the Dunlaps for the 2003 and 2004 tax years, to which they timely filed a petition contesting the deficiencies.

B.  Roy Zeluck

Mr. Zeluck owns and resides in unit 1C, which he acquired on October 15, 2001.  Mr. Zeluck also acquired a 1.75% undivided interest in the common elements of Cobblestone.  He is the owner of a custom door and window manufacturing business.  The value of unit 1C was approximately $1.5 million before the facade easement was granted to NAT.

Mr. Zeluck signed his income tax return for the tax year 2003 on April 9, 2004.  On his 2003 return he claimed a noncash charitable contribution deduction of $180,000 for the donation of the facade easement.  He deducted the entire $180,000 for 2003.

Mr. Zeluck's 2003 income tax return was prepared by his accountant, Chris Brown.  Mr. Zeluck testified that he discussed the facade easement donation with Mr. Brown and provided Mr. Brown with the informational materials given to Mr. Zeluck by the Cobblestone board.  Mr. Zeluck further testified that he relied on Mr. Brown's advice in claiming the deduction.

On February 12, 2009, respondent mailed a notice of deficiency to Mr. Zeluck for the 2003 tax year, to which Mr. Zeluck timely filed a petition contesting the deficiency.

C. <u>Christopher and Claire Baldwin Smith</u>

The Smiths own and reside in unit 1D, which they acquired on May 1, 2002. The Smiths also acquired a 1.66% undivided interest in the common elements of Cobblestone. Mr. Smith is an architect and was a member of the Cobblestone board during 2003; however, he was not very involved in the facade easement issue. He did not attend every board meeting and was not involved in the retention of Herrick Feinstein.

The Smiths timely filed their 2003 income tax return on September 20, 2004, and filed an amended 2003 return on September 8, 2005. They also timely filed their 2004 income tax return on October 14, 2005, and timely filed their 2005 income tax return on October 11, 2006. On their amended 2003 return they claimed a noncash charitable contribution deduction of $174,000 for the donation of the facade easement. The Smiths deducted $76,942 of the $174,000 for 2003 and carried forward the remaining $97,058. They deducted a cash contribution to NAT of $12,183 on their 2004 tax return as well as a portion of the $97,058 carried over from 2003, for a total of $98,769 in charitable deductions for 2004. The remaining $10,472 was carried over and deducted for 2005.

The Smiths' income tax returns and amended tax return for the years at issue were each prepared by a return preparer; the 2003 return was prepared by Ron

Ostermann while the amended 2003 return as well as the 2004 and 2005 returns were prepared by Pamela Chan, a certified public accountant. Mr. Smith testified that he provided the informational materials they received from the Cobblestone board to Ms. Chan and relied on her advice in claiming the deductions.

On February 20, 2009, respondent mailed a notice of deficiency to the Smiths for the 2003, 2004, and 2005 tax years, to which they timely filed a petition contesting the deficiencies.

### D. Jan P. Marks

Mr. Marks owned and resided in unit 2C, which he acquired on August 8, 2001. He also acquired a 2.11% undivided interest in the common elements of Cobblestone. Mr. Marks holds a B.S.E. in finance and is the chief financial officer of Pure Management Group. His responsibilities include overseeing the finance function of Pure Management Group, including financial reporting, accounting, and corporate development.

Mr. Marks timely filed his 2003 and 2004 income tax returns on April 15, 2004 and 2005, respectively. On his 2003 return he claimed a noncash charitable contribution deduction of $204,000 for the donation of the facade easement. He

deducted $154,903 of the $204,000 for 2003 and carried over and deducted the remaining $49,097 for 2004. Mr. Marks prepared his own tax returns.

On March 23, 2009, respondent mailed a notice of deficiency to Mr. Marks for the 2003 and 2004 tax years, to which he timely filed a petition contesting the deficiency.

### E. Donna Weinheim

Ms. Weinheim owned and resided in unit 2B, which she acquired on October 12, 2001. She also acquired a 2.80% undivided interest in the common elements of Cobblestone. Ms. Weinheim was a retiree who had previously worked as a creative director in advertising agencies.

Ms. Weinheim timely filed her 2003 and 2004 income tax returns on April 15, 2004 and 2005, respectively. On her 2003 return she claimed a noncash charitable contribution deduction of $183,000 for the donation of the facade easement. She deducted $178,994 of the $183,000 for 2003 and carried over and deducted the remaining $4,006 for 2004.

Ms. Weinheim's income tax returns for the years at issue were prepared by Steve Fruschtick, her accountant of 25 years. She testified that she discussed the facade easement donation with him and relied on his advice in claiming the deductions.

On March 19, 2009, respondent mailed a notice of deficiency to Ms. Weinheim for the 2003 and 2004 tax years, to which she timely filed a petition contesting the deficiencies.

### F. Susan G. Anderson and Rick B. Honey

Anderson/Honey resided in unit 2E. Ms. Anderson acquired unit 2E as well as a 2.59% undivided interest in the common elements of Cobblestone on August 9, 2001.

Anderson/Honey filed their 2003 income tax return on August 24, 2004. On their 2003 return they claimed a noncash charitable contribution deduction of $234,000 for the donation of the facade easement. They deducted $88,694 of the $234,000 for 2003.

Anderson/Honey's 2003 tax return was prepared by Suhendra Patel of Arthur Green & Co., PC. Mr. Honey testified that he discussed the facade easement donation with Mr. Patel and relied on Mr. Patel's advice in claiming the deductions. Mr. Patel died before the trial.

On March 19, 2009, respondent mailed a notice of deficiency to Anderson/ Honey for the 2003 tax year, to which they timely filed a petition contesting the deficiency.

G.  Thomas Rukan and Alexandra Wheeler

Rukan/Wheeler resided in unit 6C during 2003.  Ms. Wheeler acquired unit 6C as well as a 3.78% undivided interest in the common elements of Cobblestone on June 7, 2002.

Rukan/Wheeler timely filed their 2003 income tax return on April 15, 2004, their 2004 income tax return on April 15, 2005, and their 2005 income tax return on April 15, 2006.  On their 2003 return they claimed a noncash charitable contribution deduction of $282,000 for the donation of the facade easement.  They deducted $16,033 of the $282,000 for 2003 and carried the remaining $265,967 forward.  They also deducted a cash contribution to NAT of $19,734 for 2003.  For 2004 they deducted $54,068 of the $265,967 carried over from 2003.  Another $86,686 from the carried-over amount was deducted for 2005.

Rukan/Wheeler's income tax returns for the years at issue were prepared by Richard Gentilozzi, Ms. Wheeler's accountant and tax adviser for 15 years.  Ms. Wheeler primarily handled the couple's taxes and testified that she discussed the facade easement donation with Mr. Gentilozzi and provided him with all documents she received on the subject.  Ms. Wheeler further testified that she relied on Mr. Gentilozzi's advice in claiming the deductions.

Rukan/Wheeler were not aware that part of their cash contributions to NAT were later paid to ABC and the Cobblestone board. They conceded that they claimed the cash contribution deduction for the incorrect tax year (2003) and claim they are entitled to the same deduction for 2004 instead. Respondent does not object to the new claim but still seeks to disallow the deduction as claimed for 2004.

On May 26, 2009, respondent mailed a notice of deficiency to Rukan/Wheeler for the 2003, 2004, and 2005 tax years, to which they timely filed a petition contesting the deficiencies.

5. Expert Witnesses and Other Information

A trial was held May 10 through 13, 2010, in Washington, D.C. No one from Herrick Feinstein testified, and none of petitioners' tax return preparers testified. Respondent subpoenaed the return preparers to testify but chose not to call them.

Both petitioners and respondent submitted two expert reports. Respondent's experts were John Guyer and Timothy Barnes. Mr. Guyer is a senior appraiser for the Internal Revenue Service and has over 25 years of appraisal experience. Before working for the Internal Revenue Service, Mr. Guyer was director of valuation and consulting at Landauer Realty Group, Inc., in Manhattan, New York, and managing

director at Barnett Appraisal in Little Silver, New Jersey. Mr. Barnes is the managing director of the Capital Markets Group at Cushman & Wakefield, Inc., in New York, New York, and has over 25 years of appraisal experience. Before joining Cushman & Wakefield, Inc., Mr. Barnes was the director of real estate practice at PricewaterhouseCoopers LLP in New York, New York, and an employee at Marchitelli Barnes & Co., Inc., in New York, New York.

Petitioners' experts were Marilyn Weitzman and Michael Ehrmann. Ms. Weitzman is president of the Weitzman Group, Inc., in New York, New York. Ms. Weitzman's prior appraisal experience includes being a principal at Korpacz & Weitzman, Inc., in New York, New York, and assistant vice president of the Investment Services Division of Landauer Associates, Inc., in New York, New York. Mr. Ehrmann is the vice president of Jefferson and Lee Appraisals, Inc., in Pittsburgh, Pennsylvania. Although his employer's mailing address is in Pennsylvania, Mr. Ehrmann has appraised several preservation easements in New York, New York. Mr. Ehrmann has also taught several real estate appraisal continuing education courses throughout the country.

## OPINION

Respondent puts forth the following arguments in support of his contention that petitioners are not entitled to charitable contribution deductions under section 170 as a result of the facade easement donation:

(1) the Cobblestone board did not have power to grant a facade easement to NAT;

(2) the facade easement deed was not recorded until 2004, making the deductions claimed for 2003 improper;

(3) petitioners have not substantiated their charitable contributions;

(4) the facade easement granted is invalid under section 170 and the related regulations; and

(5) even if the facade easement were valid, it has no value.

In addition, respondent argues that cash payments made by the Dunlaps, the Smiths, and Rukan/Wheeler to NAT are not deductible as charitable contributions under section 170 because: (1) the cash payments were not "contributions or gifts" within the meaning of section 170(c); or (2) the cash payments were nondeductible conditional gifts.

Finally, respondent argues that petitioners are liable for accuracy-related penalties under section 6662(a) and (h).

Because we find that the facade easement donated to NAT had no value, we only address that argument, the cash contribution issue, and the accuracy-related penalties.

I. Burden of Proof

The Commissioner's determinations in a notice of deficiency are presumed correct, and taxpayers bear the burden of proving, by a preponderance of the evidence, that these determinations are incorrect. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Tax deductions are a matter of legislative grace, and a taxpayer has the burden of proving entitlement to the deductions claimed. Rule 142(a)(1); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Petitioners argue that section 7491(a)(1) shifts the burden of proof to respondent in these cases. Petitioners also claim, and respondent does not dispute, that Rule 142(a)(1) shifts the burden of proof to respondent with regard to some of the charitable contribution deductions claimed as a result of cash contributions to NAT. We address the burden of proof on the cash contribution issue in that section. For reasons explained in the facade easement valuation section, we find that petitioners failed to introduce credible evidence with respect to the fair market value of the

facade easement donated to NAT and, as a result, section 7491(a)(1) does not shift the burden of proof to respondent with respect to that issue.

II. Valuation of the Facade Easement

Generally, no established market exists for determining the fair market value of an easement. See Hilborn v. Commissioner, 85 T.C. 677, 688 (1985); Griffin v. Commissioner, T.C. Memo. 1989-130, aff'd, 911 F.2d 1124 (5th Cir. 1990). However, the "before and after" approach has been used on numerous occasions to determine the fair market values of restrictive easements with respect to which charitable contribution deductions are claimed. See, e.g., Hilborn v. Commissioner, 85 T.C. at 689; Griffin v. Commissioner, T.C. Memo. 1989-130; Stotler v. Commissioner, T.C. Memo. 1987-275; see also sec. 1.170A-14(h)(3)(i), Income Tax Regs. (before and after approach to be used where no substantial record of marketplace sales is available). We described the "before and after" approach in Hilborn v. Commissioner, 85 T.C. at 689-690, stating--

> "Before" value (before value) is arrived at by first determining the highest and best use of the property in its current condition unrestricted by the easement. At this stage, the suitability of the property's current use under existing zoning and market conditions and realistic alternative uses are examined. Any suggested use higher than current use requires both "closeness in time" and "reasonable probability." Next, to the extent possible, the three commonly recognized methods of valuing property (capitalized net operating income, replacement cost, and comparable sales) are used, but are

modified to take into account any peculiarities of the property which impact on the relative weight to be afforded each respective method.

"After" value (after value) is arrived at by first determining the highest and best use of the property as encumbered by the easement. At this stage the easement's terms and covenants are examined, individually and collectively, and compared to existing zoning regulations and other controls (such as local historic preservation ordinances) to estimate whether, and the extent to which, the easement will affect current and alternate future uses of the property. Next, the above-mentioned three approaches to valuing property are again utilized to estimate the value of the property as encumbered by the easement.

See also sec. 1.170A-14(h)(3)(ii), Income Tax Regs.

Both parties have offered expert appraisal reports and testimony to establish the amounts of petitioners' charitable contributions. An expert's opinions are admissible if they assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702. We evaluate an expert's opinion in light of the demonstrated qualifications of the expert and all evidence in the record. See Parker v. Commissioner, 86 T.C. 547, 561 (1986). We are not bound by an expert's opinions and may accept or reject an expert's opinion in full or in part in the exercise of sound judgment. See Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938); Parker v. Commissioner, supra at 561-562. We may also reach a determination of value based on our own examination of the evidence in the record.

Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), aff'g T.C. Memo. 1974-285.

A.  Description of the Expert Appraisal Reports

Both respondent and petitioners submitted two expert appraisal reports on the Cobblestone facade easement.  The parties agreed that all four experts were qualified to appraise the Cobblestone facade easement.  They each used the comparable sales approach to value Cobblestone (or individual units within Cobblestone) before the facade easement was granted.  The difference in the expert appraisals is in the after-easement values estimated by petitioners' and respondent's experts.  The Cobblestone facade easement is difficult to value because no sales of comparable easement-encumbered condominium properties existed in New York City.

Respondent's experts each appraised the Cobblestone facade easement at zero.  In reaching their conclusions, respondent's experts each:  (1) noted that the facade easement restrictions were substantially similar to restrictions already imposed by the LPC; (2) noted that the Cobblestone bylaws already required unit owners to seek approval from the Cobblestone board for changes to Cobblestone's facade; (3) recognized that posteasement sales of individual Cobblestone units showed substantial price appreciation; and (4) spoke with local real estate brokers

who opined that facade easements had no effect on sales of condominium units. The bases for the valuations reached by petitioners' experts are explained in detail below.

### 1. Marilyn Weitzman's Appraisal

Ms. Weitzman, one of petitioners' experts, estimated that the facade easement donation reduced the value of Cobblestone as a whole by $10,118,000 as of December 29, 2003. She then apportioned this loss in value to each of the unit owners' units on the basis of the percentage of the common elements each unit owner owned.

Ms. Weitzman's appraisal began by valuing the entirety of Cobblestone as a condominium at $65,109,788 using the comparable sales approach and analyzing sales of comparable condominiums. She then switched to the income approach in order to determine the percentage by which the facade easement donation reduced the value of Cobblestone. This process had several steps.

The first step in Ms. Weitzman's appraisal was to value Cobblestone before the easement donation assuming that Cobblestone was converted to rental use. In doing so, Ms. Weitzman, using various market data: (1) estimated rental revenue for each unit in Cobblestone; and (2) estimated other revenue from use of Cobblestone's parking spaces as well as revenue gained from advertising placed on

Cobblestone's facade.[11] Ms. Weitzman then estimated expenses using Cobblestone's historical expenses as well as data from other comparable condominiums. Ms. Weitzman determined that Cobblestone's net operating income as a rental property would be $1,962,941. She applied a capitalization rate of 5.75%[12] to the net operating income to arrive at a before easement income approach valuation of $34,138,106.

The second step in Ms. Weitzman's income approach was to appraise Cobblestone's rental use valuation after the easement donation. In doing so, Ms. Weitzman: (1) kept rental and parking revenue constant; (2) reduced facade advertising revenue to $0; (3) increased various expenses;[13] and (4) increased the capitalization rate to 6.35%.[14] The adjustments to revenue and expenses had the

---

[11]Ms. Weitzman assumed that Cobblestone would have been able to place advertising on the facade had the facade easement not been donated to NAT.

[12]Ms. Weitzman arrived at this capitalization rate by reviewing data such as U.S. Treasury bond yields, sales of comparable condominium units in New York City, and other apartment transactions.

[13]Ms. Weitzman projected insurance costs to rise from 54 cents to 82 cents per square foot, repair and maintenance costs to rise from 94 cents to $1.18 per square foot, and legal and professional expenses to rise from 36 cents to 45 cents per square foot. These increases appear to be based on Cobblestone's expenses for years 2002, 2003, and 2004, as well as similar expenses of comparable condominiums without easements.

[14]Ms. Weitzman's appraisal report stated that an increase in the capitalization

(continued...)

effect of reducing net operating income to $1,822,469 after the easement donation. Applying the modified capitalization rate to this modified net operating income figure led Ms. Weitzman to arrive at an after-easement income approach valuation of $28,760,817.

The third step in Ms. Weitzman's appraisal noted that the $28,760,817 after-easement income approach valuation was approximately 15.5% lower than the before-easement income approach valuation of $34,138,106. Ms. Weitzman took this 15.5% and applied it against her original comparable sales approach valuation of $65,109,788 for Cobblestone, thus arriving at a facade easement valuation of $10,118,000.

At trial Ms. Weitzman characterized her technique as "innovative" but "supportable". Petitioners' other expert witness testified that Ms. Weitzman's technique was "a very imaginative look at a difficult appraisal problem". One of respondent's expert witnesses, Timothy Barnes, criticized Ms. Weitzman's appraisal report for valuing Cobblestone as if the highest and best use of the property had changed to rental property from owner-occupied condominiums and

---

[14](...continued)
rate of this amount would be needed "in order to attract a prudent investor who would be buying an impaired bundle of rights." She stated that Cobblestone's bundle of rights would be impaired because the restrictions imposed by NAT were more stringent than those imposed by the LPC.

for improperly estimating any increases in Cobblestone's operating expenses resulting from donation of the facade easement.[15]

### 2. Michael Ehrmann's Appraisal

Mr. Ehrmann, petitioners' other expert, estimated that the facade easement donation reduced the value of Cobblestone as a whole by $6,795,000. Like Ms. Weitzman, he then apportioned this loss in value to each of the unit owners' units on the basis of the percentage of the common elements each unit owner owned.

Mr. Ehrmann's appraisal report states that he "utilized the Comparable Sales Approach * * * as the sole method to estimate the value of the subject property before and after donation of the facade easement." However, part of Mr. Ehrmann's appraisal report involves discounting sales across several years back to a constant date. At trial Mr. Ehrmann testified that because he was dealing with multiyear sales he used the discounted cashflow approach in part, which straddles the fence between the comparable sales approach and the income capitalization approach.

Mr. Ehrmann began by estimating the value of Cobblestone before donation of the facade easement at $67,960,000 using the comparable sales approach. To

---

[15]Mr. Barnes testified "that there were some one-time blips in some expenses" such as insurance which distorted Ms. Weitzman's results. A review of Cobblestone's tax returns from 2002 through 2007 confirms this testimony.

determine the value of Cobblestone after the facade easement donation Mr.

Ehrmann compared the sale prices of all after-easement nonpenthouse sales (11

sales in total) of Cobblestone units with 71 sales of nonpenthouse, non-easement-

encumbered condominiums that occurred during the same period from 2004 to

2009.[16] He also compared 2 after-easement Cobblestone penthouse sales with 11

penthouse sales in other properties.

Mr. Ehrmann's appraisal report states that in order to compare the sales of

Cobblestone units with sales of units from other buildings he discounted all sales

data to a net present value as of the appraisal date (December 29, 2003). His

appraisal report recognized that "Generally, discounting is utilized to develop net

present values for anticipated revenues." However, Mr. Ehrmann "believe[s] that

development of net present values (back to the easement date) is an appropriate and

valuable method for determining what impact the easement has had on the subject

revenues."

In order to discount the sales data back to December 29, 2003, Mr. Ehrmann

had to first develop a discount rate. He was unable to find data on discount rates

---

[16]These 71 sales were from 7 condominiums which Mr. Ehrmann found comparable to Cobblestone. The comparable condominiums were subject to LPC regulations, but no information was provided on whether they had the same "sound, first class condition" designation which Cobblestone had.

specifically applicable to residential condominiums; however, the Korpacz Real Estate Investor Survey did provide discount rates for multifamily rental housing from eight quarters in 2004, 2008, and 2009. Mr. Ehrmann found multifamily rental housing to share many of the same characteristics as residential condominiums. Although the average discount rate for multifamily rental housing was 9.19% using the eight quarters Mr. Ehrmann chose, Mr. Ehrmann believed that residential real estate condominiums were a riskier investment than multifamily housing and therefore used a discount rate of 10%.

Applying his 10% discount rate to the 11 Cobblestone nonpenthouse sales and 71 comparable nonpenthouse sales from 2004-09 led Mr. Ehrmann to find that the discounted value of the comparable sales ($837.62 per square foot) was 16.45% higher than the discounted value of Cobblestone unit sales ($719.27 per square foot). The appraisal report stated that "It is also significant to note that the comparable properties had 19 sales in 2007 and 2008 and * * * [Cobblestone] had no units transfer during this period. Many owners of easement encumbered properties around the country have told me that the easements have resulted in delays in finding buyers for their properties."

Mr. Ehrmann's appraisal report next made several adjustments to the 16.45% figure. He first reduced this figure by 2.05% (to 14.40%) as a result of differences

between Cobblestone and the comparable properties, such as various amenities, parking, and building condition. He further reduced the original 16.45% figure to 12% as a result of comparing penthouse sales from 2004-09 and adjusting "to reflect no measurable easement impact on the penthouses during the period under study". Finally, Mr. Ehrmann considered a continuing maintenance agreement entered into between Cobblestone and the LPC.[17] Mr. Ehrmann found the requirements of Cobblestone under the agreement to be "limited", but he further reduced the original 16.45% figure to 10%.

Mr. Ehrmann applied the 10% diminution in value to his before-easement valuation of Cobblestone to arrive at an after-easement valuation of Cobblestone of $61,165,000. Mr. Ehrmann's easement valuation was the difference between these two numbers, $6,795,000.

---

[17]Under the continuing maintenance agreement, Cobblestone was required to have Cobblestone inspected every five years by a "Preservation Architect" (to be selected from a list provided by the LPC) to make sure the building remained in sound, first class condition. The inspection was to cover various elements of both the interior and the exterior of the building. The preservation architect was required to prepare a report 45 days after each inspection which detailed work which should be completed to maintain the building in sound, first-class condition. Within nine months from the report date Cobblestone was required to either complete the work detailed in the report or else contest the required work with the LPC. The inspection, the report, and the work were all to be completed at Cobblestone's expense. Other provisions of the continuing maintenance agreement imposed reporting obligations on Cobblestone in case of fire or other damage to the property.

At trial Mr. Barnes (one of respondent's expert witnesses) criticized Mr. Ehrmann's appraisal report on several issues. Mr. Barnes' biggest critique was Mr. Ehrmann's use of discounting. Mr. Barnes opined that there is "absolutely nothing in the raw data that indicates that there's any difference in the appreciation rates or the values being achieved on the typical parabola up, up, up into 2007 and then of course down for a couple of years in the wake of the recession." Instead, Mr. Barnes claims that the act of discounting created a "huge distortion" in Mr. Ehrmann's discounted sales figures and that "it's never clear why discounting needs to be applied at all." Mr. Barnes also testified that he could not recall having ever seen a series of sales transactions set out over the actual years when they took place and then discounted back to an imaginary year zero.

Mr. Barnes explained that discounting has a smaller effect on data closer to the control time (December 29, 2003, in this case) and a larger effect on data more distant in time from the control time. When data is spaced roughly evenly over time, this is not an issue. However, the data in this case was not spaced evenly over the 2004-09 period. No sales of Cobblestone nonpenthouse units occurred during 2007 (the peak year of the real estate market) or 2008,[18] whereas 13 of the 71

_____

[18]Mr. Barnes took issue with Mr. Ehrmann's blaming the easement for this gap in sales, reasoning that it is not unusual for an owner-occupied condominium

(continued...)

comparable noneasement, nonpenthouse sales took place in 2007 and 6 took place in 2008. In addition, 3 of the 11 Cobblestone nonpenthouse unit sales occurred during 2009 (in what Mr. Barnes characterized as "post recession market conditions"), whereas only 5 of the 71 comparable sales took place in 2009. Mr. Barnes concluded that Mr. Ehrmann's methodology had resulted in a "mathematical skewing of the resale data" and that no proper sales comparison had taken place.

B. Analysis of Petitioners' Expert Appraisal Reports

Ms. Weitzman and Mr. Ehrmann reached similar before-easement values for Cobblestone, which are also similar to the before-easement value of $68,095,000 estimated by Mr. Miller and respondent's expert witnesses. We find petitioners' before-easement valuations to be reasonable and will adopt a before valuation of $68 million.

The parties' disagreement concerns how the facade easement donation affected the fair market value of Cobblestone. Petitioners' appraisals submitted by Ms. Weitzman, Mr. Ehrmann, and Mr. Miller estimate the value of the facade

[18](...continued)
with only 30 units such as Cobblestone to go through a one- or two-year period without sales.

easement at 15.5%, 10%, and 12% of the value of Cobblestone, respectively. Both of respondent's expert witnesses determined the facade easement had no value.

At trial petitioners withdrew their claim that Mr. Miller was an expert, and he did not testify. Mr. Miller's appraisal may therefore not be used as evidence of the fair market values of the facade easement. See Van Der Aa Invs., Inc. v. Commissioner, 125 T.C. 1, 6-7 (2005) (indicating that an appraisal would be inadmissible as evidence of fair market value if the author was not accepted as an expert and did not testify and make himself available for cross-examination). For reasons explained below, we decline to give Ms. Weitzman's or Mr. Ehrmann's appraisal reports any probative weight because we find that their conclusions regarding the fair market values of the facade easement lack credibility. We therefore find that petitioners failed to provide credible evidence with respect to the fair market values of the facade easements to meet their burden of sustaining any charitable contribution deduction resulting from the facade easement donation.

### 1. Ms. Weitzman's Appraisal Report

We find that Ms. Weitzman's appraisal report does not properly value the effect of the facade easement on Cobblestone's highest and best use. Ms. Weitzman's appraisal report states that "The highest and best use of the subject

site, as if vacant, is for development of a multifamily residential building * * *.  The highest and best use * * * as improved, is for continued use as [a] multifamily building".  This phrasing of Cobblestone's highest and best use left Ms. Weitzman free to alternate between treating Cobblestone as an owner-occupied condominium complex and as rental apartments.  The differences in valuations between these two uses was significant, as Ms. Weitzman's own appraisal report found.

Ms. Weitzman first valued Cobblestone as a condominium at $65,109,788 using the comparable sales approach.  In doing so, she used sales data for other comparable condominiums.  However, Ms. Weitzman then "utilized the income approach to measure the spread in value, assuming an income-producing rental property that is identical to" Cobblestone.  Using this approach she valued Cobblestone at only $34,138,106 before the easement donation and $28,760,817 after the easement donation.  She then applied this 15.5% spread back against the $65,109,788 comparable sales valuation to arrive at an easement value of $10,118,000 as of December 29, 2003.

The fact that Ms. Weitzman's valuation of Cobblestone as a rent-producing apartment building was almost half that of her valuation of Cobblestone as a condominium should have signaled to Ms. Weitzman that she was not using a constant "highest and best use" across her valuations.  Her attempts to apply the

15.5% value reduction found using the income approach to the $65,109,788 comparable sales valuation are of no use; by her own admission this 15.5% spread assumed that Cobblestone was "an income-producing rental property".

Ms. Weitzman did nothing to determine the effect that the facade easement would have on Cobblestone's value as a condominium. In addition, her appraisal report results were distorted by what Mr. Barnes characterized as "one-time blips in some expenses" such as insurance. Finally, Ms. Weitzman increased the capitalization rate under the income approach because a purchaser of Cobblestone "would be buying an impaired bundle of rights". She believed that the bundle of rights would be impaired because the restrictions imposed by NAT were more stringent than those imposed by the LPC.

Contrary to Ms. Weitzman, we do not believe that the facade easement restrictions and enforcement were any more stringent than the LPC regulations and enforcement as of the date for which Ms. Weitzman valued the easement (December 29, 2003). The LPC is a well-staffed organization which works with community groups and preservation activists to enforce its regulations applicable to historic structures such as Cobblestone. Although the LPC's regulations are slightly less rigorous than those promulgated by the Secretary of the Interior (which are the regulations purportedly enforced by NAT), Cobblestone had a special "sound, first

class condition" designation with the LPC which caused it to be subject to a higher standard of preservation than most other historic structures in New York City. Only 150 of the 26,000 structures covered by LPC regulations had this special designation.

Petitioners have argued that Cobblestone is subject to a higher level of enforcement of restrictions as a result of the facade easement and NAT's annual monitoring process. Petitioners point out that the LPC does not monitor the structures covered by its regulations and had only four full-time enforcement staff enforcing regulations on 26,000 buildings. However, Mr. Ehrmann noted that Cobblestone and the LPC had a continuing maintenance agreement under which Cobblestone was required to have Cobblestone inspected every five years by a "Preservation Architect" (to be selected from a list provided by the LPC) to make sure the building remained in sound, first-class condition. Unlike NAT's annual monitoring process, this inspection covered both the interior and exterior of Cobblestone. Under the agreement, Cobblestone was required to take certain actions recommended by the preservation architect to make sure Cobblestone stayed in a sound, first-class condition, or else contest such recommendations with the LPC. The agreement imposed additional obligations on Cobblestone in case of fire or other damage to the property.

In addition to the LPC's enforcement efforts, we note that NAT's own enforcement efforts of restrictions on Cobblestone were poor or nonexistent in 2003. Indeed, Cobblestone and four other properties were somehow not included in NAT's easement monitoring process until January 2006.

A review of NAT's financial data also appears to show an organization more concerned with making money for SMS (a for-profit entity which employed many of the people who were held out to third parties as working for NAT and which was owned by the same two people who founded NAT and worked as directors and presidents of NAT) than monitoring and enforcing the terms of the facade easements it held. From 2002 to 2006 NAT paid the following amounts to SMS: $483,456, $5.5 million, $5.8 million, $2.6 million, and $181,154, respectively.[19] From 2001 to 2003 NAT paid the following amounts in monitoring photography expenses: less than $553, less than $7,629, and $900, respectively. From 2004 to 2007 NAT spent the following amounts on total monitoring expenses: $13,345, $12,113, $56,585, and $115,884, respectively. At the end of years 2001 to 2007 NAT held approximately the following number of easements: 18, 86, 320, 570, 650, 750, and 800, respectively.

_____

[19]These payments to SMS represent the following percentages of NAT's total expenses during the years 2002 to 2006: 55%, 95%, 89%, 87%, and 4%, respectively.

It appears that from 2001 through 2005 NAT spent only a nominal amount to monitor the easements it held, while it paid over $14 million to SMS. When NAT's obligations to SMS ended in 2006,[20] NAT's monitoring expenses showed a corresponding increase which was disproportionate to the number of easements added in that year. We believe this increase in expenses in 2006 and 2007 is evidence that NAT recognized it was spending an insufficient amount to monitor the easements it held during 2001 through 2005. These facts support our belief that the facade easement granted to NAT did not result in increased restrictions on Cobblestone above those required and enforced by the LPC on December 29, 2003 (the date as of which Ms. Weitzman appraised the facade easement). Cf. Simmons v. Commissioner, T.C. Memo. 2009-208, aff'd, 646 F.3d 6 (D.C. Cir. 2011) (finding that easements granted on properties in Washington, D.C., did affect the fair market values of the properties because the taxpayer showed the easements would be subject to a higher level of enforcement than District of Columbia preservation laws).

---

[20]NAT terminated its agreement with SMS because of concerns regarding NAT's entanglement with a for-profit entity.

For the reasons discussed above, we decline to give Ms. Weitzman's appraisal report any probative weight, and we find that her conclusion regarding the fair market value of the facade easement lacks credibility.

### 2. Mr. Ehrmann's Appraisal Report

We find that Mr. Ehrmann's method of discounting sales data in this case improperly skewed the resale data and that no proper comparison of sale prices took place.[21] Discounting data from 2004 to 2009 of 11 Cobblestone nonpenthouse unit sales and 71 comparable nonpenthouse condominium unit sales back to the date of the facade easement grant (December 29, 2003) using a 10% discount rate showed that the discounted value of the comparable sales ($837.62 per square foot) was 16.45% higher than the discounted value of Cobblestone unit sales ($719.27 per square foot). After adjustments resulting from differences in Cobblestone and the comparable condominium amenities, penthouse sales data, and Cobblestone's Continuing Maintenance Agreement with the LPC, Mr. Ehrmann concluded that the facade easement reduced the value of Cobblestone by 10%.

---

[21]We do not decide whether Mr. Ehrmann's methodology itself is improper per se. Our analysis is limited to the unique facts of this case.

Although Mr. Ehrmann's appraisal report covers the years 2004 to 2009, we concur with Mr. Barnes that Mr. Ehrmann's discounting method skewed the resale data as a result of the inclusion of Cobblestone and comparable sales data from 2007 to 2009. No sales of Cobblestone nonpenthouse units occurred during 2007 (the peak year of the real estate market) or 2008, whereas 13 of the 71 comparable noneasement, nonpenthouse sales took place in 2007, and 6 took place in 2008. In addition, 3 of the 11 Cobblestone nonpenthouse unit sales occurred during 2009 (in what Mr. Barnes characterized as "post recession market conditions"), whereas only 5 of the 71 comparable sales took place in 2009. As a result of the spacing of the data, Cobblestone discounted sale values were negatively affected by an undersampling of sales in the best real estate year (2007) and an oversampling of sales in the worst real estate year (2009). That effect was not accounted for by Mr. Ehrmann's appraisal report.

Had Mr. Ehrmann chosen to exclude the years 2007 to 2009 and use only the data from 2004 to 2006, his results would have been quite different. Using Mr. Ehrmann's same discount rates, the comparable condominium units would have sold at an average discounted value of $862.94 per square foot and Cobblestone units would have sold at an average discounted value of $799.85 per square

foot.[22]  This represents an 7.89% spread in sales value, as opposed to the 16.45%

spread found by Mr. Ehrmann.  Reducing the 7.89% by the same factors which

caused Mr. Ehrmann to reduce his 16.45% figure by 6.45% (as a result of

differences in Cobblestone and the comparable condominium amenities, penthouse

sales data,[23] and Cobblestone's Continuing Maintenance Agreement with the LPC)

yields a final spread of approximately 3% between Cobblestone unit sale prices and

comparable condominium sale prices, much smaller than the final 10% value

reached by Mr. Ehrmann.  Given the low number of Cobblestone sales,[24] we do not

believe this 3% is significant.

---

[22]Even had Mr. Ehrmann excluded only years 2007 and 2009 (the years with the highest levels of disproportionate sales data and the best/worst real estate years) and kept the 2008 data, the average discounted sales value of the comparable condominiums would have only increased by only $3.23 per square foot to $866.17. As there were no Cobblestone unit sales in 2008, that number would remain unchanged.

[23]The penthouse sales data would have a smaller effect using only the 2004-06 data than the effect it had on the 2004-09 data.  This is because Mr. Ehrman averaged the 16% total value of Cobblestone represented by the penthouses and unaffected by the facade easement into the 84% of Cobblestone which was affected by the easement.  As the effect of the easement on the 84% of Cobblestone is not as great considering only the 2004-06 data, averaging in the unaffected 16% of Cobblestone would not result in as big an effect on the final value.

[24]Only 11 sales took place from 2004 to 2009, and only 8 of these were from 2004 to 2006.

Mr. Ehrmann's appraisal report appeared to recognize an issue regarding the lack of Cobblestone sales in 2007 and 2008, stating: "It is also significant to note that the comparable properties had 19 sales in 2007 and 2008 and * * * [Cobblestone] had no sales during this period. Many owners of easement encumbered properties around the country have told me that the easements have resulted in delays in finding buyers for their properties."[25] Regardless of the soundness of this reasoning, it does not explain why it is proper to include data from years in which Cobblestone sales were either nonexistent or disproportionate to the number of comparable condominium units sold.

For the reasons stated above, we decline to give Mr. Ehrmann's appraisal report any probative weight, and we find that his conclusion regarding the fair market value of the facade easement lacks credibility.

C. Conclusion Regarding Valuation of the Facade Easement

Any encumbrance on real property, however slight, would ordinarily tend to have some negative effect on that property's fair market value. Evans v.

---

[25]Mr. Ehrmann's reasoning on this point is confounding. Perhaps it would be logical had the gap in Cobblestone sales occurred soon after the easement had been granted, but in this case the only gap is years after the easement grant. We are more inclined to believe Mr. Barnes' testimony that it is not unusual for a 30-unit condominium such as Cobblestone to go through a one- or two-year period without sales.

Commissioner, T.C. Memo. 2010-207. Even a nominal encumbrance that is placed by the current owner of the property would, at the very least, deprive a subsequent owner of the opportunity of placing a similar encumbrance on that property. Id. However, petitioners have failed to provide sufficient credible evidence with respect to the fair market values of the facade easement to meet their burden of proving entitlement to their claimed charitable contribution deductions. See, e.g., id.

Respondent disallowed the full amounts of petitioners' claimed deductions, and the burden was on petitioners to show that this disallowance was in error. See Rule 142(a) ("The burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court"); Anselmo v. Commissioner, 757 F.2d 1208, 1210-1211 (11th Cir. 1985) (taxpayer had the burden of proving that the valuation of donated property should have been higher than that stated in the notice of deficiency), aff'g 80 T.C. 872 (1983). Considering the expert reports and other evidence, we find that petitioners have failed to meet their burden of proving that the value of the Cobblestone facade easement was greater than zero. We conclude that petitioners are not entitled to any deductions resulting from donation of the Cobblestone facade easement.

III. Cash Contribution Deductions

Respondent, in amendments to his answer, first challenged the deductibility of the cash contributions made to NAT by the Dunlaps, the Smiths, and Rukan/Wheeler. Cash contributions made to NAT by the remaining petitioners are not at issue.

A. Burden of Proof

Petitioners note, and respondent does not dispute, that respondent bears the burden of proof with regard to the Dunlaps and the Smiths under Rule 142(a)(1) because respondent first challenged the cash contributions in amendments to his answer. Petitioners do not argue Rule 142(a)(1) applies to Rukan/Wheeler, because Rukan/Wheeler conceded (in their response to respondent's amended answer) that the deduction was incorrectly claimed on their 2003 return. Rukan/Wheeler now seek the same deduction for 2004 instead.

Petitioners claim that respondent still bears the burden of proof under section 7491(a)(1) with respect to a 2004 deduction by Rukan/Wheeler. Section 7491(a)(1) provides that if, in any court proceeding, the taxpayer introduces credible evidence with respect to factual issues relevant to ascertaining the taxpayer's liability for a tax (under subtitle A or B), the burden of proof with respect to such factual issues will be placed on the Commissioner. Credible evidence is the quality of evidence

which, after critical analysis, a court would find sufficient to base a decision on the issue on if no contrary evidence were submitted. Baker v. Commissioner, 122 T.C. 143, 168 (2004) (quoting Higbee v. Commissioner, 116 T.C. 438, 442 (2001)). Section 7491(a)(1) applies only if the taxpayer complies with substantiation requirements, maintains all required records, and cooperates with reasonable requests by the Commissioner for witnesses, information, documents, meetings, and interviews. Sec. 7491(a)(2).

We find, and respondent does not dispute, that Rukan/Wheeler maintained all required records and cooperated with all respondent's reasonable requests. However, respondent argues that Rukan/Wheeler failed to comply with the substantiation requirements.

Section 170(f)(8)(A) provides that no deduction is allowed under section 170(a) for any contribution of $250 or more unless the taxpayer substantiates the contribution with a contemporaneous written acknowledgment of the contribution by the donee organization. The acknowledgment must contain the following information: (1) the amount of cash and a description (but not value) of any property other than cash contributed; (2) whether the donee organization provided any goods or services in consideration, in whole or in part, for any property contributed; and (3) a description and good-faith estimate of the value of any goods

or services provided to the taxpayer in exchange for the contribution. Sec. 170(f)(8)(B). The acknowledgment is contemporaneous if it is obtained by the taxpayer by the earlier of the date on which the taxpayer files a return for the taxable year for which the deduction is claimed, or the due date, including extensions, of the return. Sec. 170(f)(8)(C).

Additionally, section 170(f)(8) disallows a charitable contribution deduction where the donee organization's contemporaneous written acknowledgment is erroneous and is not a good-faith estimate of the value of goods or services it provided and where the taxpayer unquestioningly and self-servingly uses that erroneous statement to claim a charitable contribution deduction larger than the one to which he or she would be entitled under section 170. Addis v. Commissioner, 118 T.C. 528, 537 (2002) (citing sections 1.170A-13(f)(7) and 1.170A-1(h)(4)(ii), Income Tax Regs.), aff'd, 374 F.3d 881 (9th Cir. 2004).

In response to the cash contribution made by Rukan/Wheeler, NAT mailed them a letter dated March 30, 2004, which stated that they had contributed $19,734 in cash to NAT and had received no goods or services in return. Respondent acknowledges that on its face the letter comports with the substantiation requirements of section 170(f). However, respondent argues the evidence shows that all unit owners (including Rukan/Wheeler) received services from NAT in

return for their cash donations.  Respondent contends these services included:  (1) administrative work done by NAT to facilitate the easement donation; (2) NAT's referral of Miller Samuel to Mr. McGrath for the appraisal; and (3) the administrative work for which ABC and the Cobblestone board were paid by NAT and SMS.  Respondent claims that Rukan/Wheeler unquestioningly and self-servingly relied on the letter, which did not disclose the value of services received, and that their claimed deduction should therefore be disallowed.

We disagree with respondent.  We have found that:  (1) any administrative work completed by NAT was done so that NAT would be assured of holding an enforceable facade easement in perpetuity and that any benefits accruing to unit owners as a result of such work were incidental and insignificant; (2) NAT's referral of Miller Samuel had either no value or an insignificant value; and (3) Rukan/Wheeler were not aware that a small part of their cash contribution made to NAT was later paid to ABC and the Cobblestone board.  As all the services upon which respondent bases his argument were either insignificant or unknown to Rukan/Wheeler, we find the statements made by NAT in the contribution acknowledgment letter sent to Rukan/Wheeler were either not erroneous and not made in bad faith or, alternatively, that Rukan/Wheeler did not unquestioningly and self-servingly rely on the statements to claim a deduction larger than the one to

which they would have been entitled under section 170. We therefore find that Rukan/Wheeler complied with the substantiation requirements of section 170(f)(8). See, e.g., Kaufman v. Commissioner, 136 T.C. 294, 322 (2011) (in rejecting the Commissioner's substantiation argument in a facade easement case involving NAT we considered whether the taxpayer had any knowledge contribution letters were inaccurate or whether services provided by NAT had any value).

Upon consideration of the evidence presented, we additionally find that petitioners produced credible evidence with respect to the cash contribution made by Rukan/Wheeler. Section 7491(a) therefore applies and shifts the burden of proof to respondent with respect to Rukan/Wheeler's cash contribution.

B. Whether the Cash Contributions Were "Contributions or Gifts" Under Section 170(c)

A cash payment to a qualified organization may be deductible under section 170 if the payment is a "contribution or gift" under section 170(c). As the Supreme Court has stated, a payment of money generally cannot constitute a charitable contribution if the contributor expects a substantial benefit in return. United States v. Am. Bar Endowment, 477 U.S. 105, 116 (1986) (citing S. Rept. No. 83-1622, at 196 (1954)); see also Singer Co. v. United States, 196 Ct. Cl. 90 (1971) (if the

transferor expects to receive a sufficient quid pro quo in exchange for the transferor's transfer to charity, the transfer is not deductible).

### 1. Required Cash Contributions

Respondent first argues that petitioners' cash contributions to NAT were not made with the requisite charitable intent. Respondent asserts that petitioners made the cash payments because they knew they had to in order for NAT to accept their facade easement donation and to send them the Forms 8283 necessary to claim the resulting deduction. Respondent claims that the cash payments were thus made "to receive a valuable benefit" (the ability to take a deduction for donation of the facade easement) and are therefore not charitable contributions. We previously rejected this argument in Kaufman v. Commissioner, 136 T.C. at 318-319, stating that "it is difficult to see how the cash donation benefits the donor other than in making possible the contribution of the associated property and giving rise to an added charitable contribution deduction (an acceptable benefit)." We agree with the analysis in Kaufman and reject this argument.

### 2. Fee For Services

Respondent next argues that petitioners' cash payments to NAT were part of a commercial, quid pro quo transaction in which cash was paid in return for services performed by NAT. Respondent contends these services included the

administrative work for which ABC and the Cobblestone board were paid by NAT and SMS, certain administrative work done by NAT, and NAT's referral of Miller Samuel to Cobblestone for the appraisal. As a result, respondent would have us find that the cash payments were not deductible as contributions or gifts under section 170. We disagree.

If a transaction is structured in the form of a quid pro quo where it is understood that the taxpayer's money will not pass to the charitable organization unless the taxpayer receives a specific benefit in return and where the taxpayer cannot receive the benefit unless he pays the required price, then the transaction does not give rise to a deduction under section 170. Graham v. Commissioner, 822 F.2d 844, 849 (9th Cir. 1987), affg. 83 T.C. 575 (1984), aff'd sub nom. Hernandez v. Commissioner, 490 U.S. 680 (1989); Scheidelman v. Commissioner, T.C. Memo. 2010-151. For respondent to meet his burden of proof and succeed with his fee-for-services argument, the evidence must show a quid pro quo; that is, reciprocally, petitioners made a payment and NAT provided services of substantial value. Kaufman v. Commissioner, 136 T.C. at 320.

We have already found that NAT's referral of Miller Samuel to Cobblestone and the minor administrative work done by NAT was of an insignificant value to petitioners. With respect to the payments made by NAT and SMS to ABC and the

Cobblestone board, respondent has failed to show the cash contributions made by the Dunlaps, the Smiths, and Rukan/Wheeler reciprocated NAT's undertakings because respondent failed to show that any petitioner was aware of the payments. As a result, we find respondent has not met his burden of proving a quid pro quo between NAT and petitioners.

### 3. Conditional Payment

Respondent argues the amounts of the cash contributions to NAT were based on the appraised value of the facade easement, and therefore the contributions were conditional gifts for which no deduction is allowed. Section 1.170A-1(e), Income Tax Regs., provides that "If as of the date of a gift a transfer for charitable purposes is dependent upon the performance of some act or the happening of a precedent event in order that it might become effective, no deduction is allowable unless the possibility that the charitable transfer will not become effective is so remote as to be negligible." According to respondent, assuming the facade easement was appraised at zero, NAT would have refunded all of the cash contributions made by petitioners.

Respondent's argument is not entirely clear. Petitioners' cash contributions were not made until after the Miller Samuel appraisal, and consequently there was no chance that the Miller Samuel appraisal would result in NAT's refunding some

percentage of petitioners' contributions. Respondent's proposed findings of fact hint that respondent is also arguing that a subsequent appraisal which placed a lower value on the facade easement than the Miller Samuel appraisal could result in portions of the cash contributions' being refunded. However, we have found no evidence which would suggest that a subsequent appraisal which affected the value of the facade easement would result in any portions of the cash contributions' being refunded to petitioners. Respondent's only citation of evidence in his proposed findings of fact was misguided; it referred to a repayment of the facade easement donation deduction by petitioners to the IRS, rather than NAT's refunding portions of the cash contribution to petitioners. We find that respondent has not met his burden of proving the cash contributions were conditional gifts and therefore reject this argument.

### 4. Failure To Substantiate

We have previously rejected respondent's failure to substantiate his argument with respect to Rukan/Wheeler. See supra pp. 59-62. Following the same logic, we find that respondent has failed to prove his substantiation argument with respect to the Dunlaps and the Smiths.[26]

---

[26]Petitioners showed that Rukan/Wheeler were not aware of the payments made by NAT and SMS to ABC and the Cobblestone board. Although petitioners
(continued...)

C. <u>Conclusion on the Cash Contribution Issue</u>

The Dunlaps, the Smiths, and Rukan/Wheeler are entitled to charitable contribution deductions under section 170 for 2004 as a result of the cash contributions they made to NAT in that year.

IV. <u>Accuracy-Related Penalties</u>

Because we have found that the Dunlaps, the Smiths, and Rukan/Wheeler were entitled to deductions for their cash contributions made to NAT and respondent did not contest deductions claimed by other petitioners for cash contributions, we consider only penalties arising from our disallowance of the facade easement donation deductions. Respondent determined penalties against all petitioners except for Mr. Marks.

Section 6662(a) and (b)(1), (2), and (3) imposes an accuracy-related penalty if any part of an underpayment of tax required to be shown on a return is due to, among other things, negligence or disregard of rules or regulations, a substantial understatement of income tax, or a substantial valuation misstatement. Respondent argues that petitioners are liable for either a substantial or gross valuation penalty

---

[26](...continued)
did not make such a showing with respect to the Dunlaps and the Smiths, it was unnecessary for them to do so because respondent had the burden of proof with respect to the Dunlaps and the Smiths and failed to show that the Dunlaps and the Smiths were aware of the payments.

pursuant to section 6662(b)(3) and (e) or (h).[27]  Section 6662(b)(3) imposes a 20% penalty on that portion of an underpayment which results from a substantial valuation misstatement.  There is a substantial valuation misstatement if the value of any property claimed on the return is 200% or more of the amount determined to be the correct amount.  Sec. 6662(e)(1)(A).  Section 6662(h) increases the penalty to 40% in the case of a gross valuation misstatement.  There is a gross valuation misstatement if the value is 400% or more of the value determined to be the correct amount.  Sec. 6662(h)(2)(A)(i).

Respondent bears the burden of production on the applicability of the accuracy-related penalty in that he must come forward with sufficient evidence indicating that it is proper to impose the penalty.  See sec. 7491(c); see also Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  Once respondent meets this burden, petitioners bear the burden of proof, including the burden of proving that the penalty is inappropriate because of reasonable cause and good faith.  See Higbee v. Commissioner, 116 T.C. at 446-447.  The facts of these cases lead us to conclude

---

[27]Respondent concedes that no petitioner is liable for the sec. 6662(a) penalty because of negligence or disregard of rules or regulations.

that respondent has met his burden of production with respect to the accuracy-related penalty.

Petitioners argue that accuracy-related penalties do not apply because petitioners meet the reasonable cause defense of section 6664(c)(1). Pursuant to that section, accuracy-related penalties under section 6662 do not apply to any portion of an underpayment for which a taxpayer establishes that he or she: (1) had reasonable cause; and (2) acted in good faith. The reasonable cause exception does not apply, however, in the case of a substantial or gross valuation overstatement with respect to property for which a charitable contribution deduction was claimed under section 170 unless the claimed value of the property was based on a "qualified appraisal" by a "qualified appraiser" and the taxpayer made a good faith investigation of the value of the property. Sec. 6664(c)(2).

A. Whether Petitioners Meet the Reasonable Cause and Good Faith Exception

Whether taxpayers acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including their efforts to assess their proper tax liabilities, their knowledge and experience, and the extent to which they relied on the advice of a tax professional. Sec. 1.6664-4(b)(1), Income Tax Regs. We

agree with petitioners that they acted with reasonable cause and that they acted in good faith.

Reliance on professional advice may constitute reasonable cause and good faith, but "it must be established that the reliance was reasonable." Freytag v. Commissioner, 89 T.C. 849, 888 (1987), aff'd on another issue, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991); sec. 1.6664-4(b)(1), Income Tax Regs. We have previously held that

> for a taxpayer to rely reasonably upon advice so as possibly to negate a section 6662(a) accuracy-related penalty determined by the Commissioner, the taxpayer must prove * * * that the taxpayer meets each requirement of the following three-prong test: (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment.

Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). Petitioners claim they relied upon professional advice provided by Herrick Feinstein, Miller Samuel, and their individual return preparers.

Petitioners were aware the Cobblestone board had retained Herrick Feinstein to review the facade easement donation deduction. Petitioners also received the Herrick Feinstein opinion letter, which concluded that the facade easement donation

constituted a qualified conservation contribution which could be deducted pro rata by each unit owner. No one from Herrick Feinstein was called to testify at trial.

Citing <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1158 (1946), <u>aff'd</u>, 162 F.2d 513 (10th Cir. 1947), respondent contends that we should infer from petitioners' failure to call any witnesses from Herrick Feinstein that their testimony would have been unfavorable to petitioners. However, if a witness is equally available to both parties and neither party calls that witness at trial, then no adverse inference is warranted. <u>See</u> <u>United States v. Rollins</u>, 862 F.2d 1282, 1297-1298 (7th Cir. 1988); <u>Kean v. Commissioner</u>, 469 F.2d 1183, 1187-1188 (9th Cir. 1972), <u>aff'g on this issue, rev'g on another issue</u> 51 T.C. 337, 343-344 (1968); <u>Grossman v. Commissioner</u>, T.C. Memo. 1996-452, <u>aff'd</u>, 182 F.3d 275 (4th Cir. 1999). Respondent has given us no reason to believe that a witness from Herrick Feinstein was not equally available to both parties. Thus, we do not apply the adverse inference rule. <u>See</u> <u>Jordan v. Commissioner</u>, 134 T.C. 1, 10 (2010); <u>Dang v. Commissioner</u>, T.C. Memo. 2002-117.

Although we do not make an adverse inference from petitioners' failure to have someone from Herrick Feinstein testify, we do not believe petitioners have proven that their reliance on Herrick Feinstein's opinion letter was reasonable.

Petitioners provided no evidence concerning the fact that Mr. Russo did not sign the opinion letter or that the opinion letter appears to have been written after July 2004 (given that the opinion letter cites a document not released until that month), a point after which many of petitioners had already filed their 2003 tax returns claiming a deduction resulting from the facade easement donation. We also note that petitioners apparently made no inquiries into Herrick Feinstein's qualifications to represent Cobblestone. We find petitioners have not proven that their reliance on Herrick Feinstein's advice was reasonable.

Petitioners also cannot rely on advice given to them by their individual tax advisers. Respondent again contends that under the rule in Wichita Terminal Elevator Co., 6 T.C. 115, we should infer from petitioners' failure to call their tax advisers as witnesses that the advisers' testimony would have been unfavorable to petitioners. However, if a witness is equally available to both parties and neither party calls that witness at trial, then no adverse inference is warranted. See United States v. Rollins, 862 F.2d 1282; Kean v. Commissioner, 469 F.2d 1183; Grossman v. Commissioner, T.C. Memo. 1996-452. In this case the advisers were equally available to both parties. Indeed, respondent subpoenaed petitioners' tax advisers and originally intended to call them as witnesses but then chose not to do so. Thus,

we do not apply the adverse inference rule.  See Jordan v. Commissioner, 134 T.C. at 10.

Although we do not make an adverse inference from petitioners' failure to call their tax advisers, we do not believe petitioners have proven they reasonably relied on the advice of their advisers.  We have found a failure to prove reasonable reliance when taxpayers do not call their tax advisers to testify and rely only on their own self-serving testimony.  Heller v. Commissioner, T.C. Memo. 2008-232, aff'd, 403 Fed. Appx. 152 (9th Cir. 2010); see also Swanson v. Commissioner, T.C. Memo. 2009-31.  Considering the only evidence presented is petitioners' self-serving testimony that they relied on their advisers' advice and supplied their advisers with all necessary and accurate information, we do not believe petitioners have satisfied the three-pronged test of Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, to prove their reliance on the advice given to them was reasonable.[28]

_____

[28]We separately note the situation arising with Anderson/Honey's adviser, Mr. Patel, who died before the trial.  Although they could not call Mr. Patel to testify, Anderson/Honey made no attempt to prove their reasonable reliance by other means (such as calling someone from Mr. Patel's company, Arthur Green & Co., P.C., to testify).  We therefore do not believe Anderson/Honey have proved they reasonably relied on Mr. Patel's advice.

Although their claimed reliance on advice given to them by Herrick Feinstein and their tax advisers does not benefit petitioners, other facts support a finding that petitioners acted reasonably and in good faith. We first note that petitioners disclosed the contribution of the facade easement on their tax returns. See Rolfs v. Commissioner, 135 T.C. 471, 496 (2010) (considering disclosure on tax returns as a factor to be considered in the reasonable cause and good faith test), aff'd, 668 F.3d 888 (7th Cir. 2012). Petitioners attached to their tax returns qualified appraisals completed by a qualified appraiser (discussed infra pp. 78-88) as well as Forms 8283 which substantially complied with respondent's requirements.

With regard to Forms 8283, respondent points out that petitioners failed to fully complete their Forms 8283. However, the appropriate standard by which to judge Forms 8283 is substantial compliance. See Bond v. Commissioner, 100 T.C. 32, 41 (1993). A taxpayer has substantially complied with substantiation requirements if he or she "'provided sufficient information to permit respondent to evaluate * * * [his or her] reported contributions, as intended by Congress.'" Simmons v. Commissioner, T.C. Memo. 2009-208 (quoting Smith v. Commissioner, T.C. Memo. 2007-368, aff'd, 364 Fed. Appx. 317 (9th Cir. 2009)).

Petitioners did fill in the most pertinent information on their Forms 8283, including: (1) Cobblestone's address and the owners' respective unit numbers; (2) the overall physical condition of the donation being a "Historic Preservation Easement Donation"; (3) their unit's portion of the appraised value of the easement; and (4) that the type of property donated was "real estate". NAT and Mr. Miller properly certified the portions of the forms they were required to certify. Petitioners also listed the amounts of the deductions they claimed on Schedules A of their tax returns.

Respondent first argues the Forms 8283 are not sufficient because petitioners did not complete all portions. However, the Instructions for Form 8283 indicate that the only portions of the form petitioners did not complete (regarding the donor's cost or basis in the donated property, the date the donor acquired the property, and how the donor acquired the property) are not absolutely necessary. The instructions notify the taxpayer that these portions may be left blank if the taxpayer has reasonable cause and attaches an explanation to the return. Instructions for Form 8283 (Rev. 1998). Although petitioners did not demonstrate reasonable cause or attach explanations, we do not believe the portions of Forms 8283 petitioners left blank are necessary to substantially comply with the Instructions.

Respondent also argues that the Forms 8283 are not sufficient because petitioners failed to describe the easement in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was contributed, as required by section 1.170A-13(c)(4)(ii)(B), Income Tax Regs. We disagree. Petitioners included both Cobblestone's address and the fact that a historic preservation easement was donated. Comparing Forms 8283 with Mr. Miller's appraisal, we believe it is obvious that the property described in Forms 8283 is the same property appraised in the appraisal. We find petitioners' Forms 8283 substantially complied with the Instructions and that petitioners made a good-faith attempt to report their contributions.

Petitioners also received Mr. Miller's appraisal, which concluded that the fair market value of the facade easement was 12% of the appraised value of Cobblestone. See 1982 East, LLC v. Commissioner, T.C. Memo. 2011-84 (considering the taxpayers' appraisal as evidence of reasonable cause and good faith). As explained further below, Mr. Miller was a qualified appraiser and the appraisal was a qualified appraisal. We find that petitioners' reliance on the Miller Samuel appraisal was reasonable under the three-pronged test in Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43.

Although petitioners did not call Mr. Miller to testify at trial, we have no reason to believe that Mr. Miller was not equally available to both parties and therefore do not apply the adverse inference rule of <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1150.  <u>See</u> <u>United States v. Rollins</u>, 862 F.2d 1282; <u>Kean v. Commissioner</u>, 469 F.2d 1183;  <u>Dang v. Commissioner</u>, T.C. Memo. 2002-117; <u>Grossman v. Commissioner</u>, T.C. Memo. 1996-452.  In addition, the evidence showed that Mr. Miller was a competent professional who had sufficient expertise to justify reliance, petitioners provided necessary and accurate information to Mr. Miller (in allowing him to inspect both the interior and exterior of Cobblestone as part of the appraisal), and petitioners actually relied in good faith on Mr. Miller's judgment (by using his easement valuation on their tax returns, which all materials they had received, including the Primoli letter, supported as a reasonable valuation).  <u>See, e.g.</u>, <u>Evans v. Commissioner</u>, T.C. Memo. 2010-207 (finding good faith and reasonable reliance after considering the appraiser's qualifications and background, access to relevant details of the property, and reliance upon the appraisal in claiming a deduction).

In the light of all of the facts and circumstances, we find that petitioners acted reasonably and in good faith and hold that they are not liable for accuracy-related penalties under section 6662(a) and (b)(2) resulting from

substantial understatements of income tax.  We must still consider whether petitioners satisfied section 6664(c)(3) so as to make the reasonable cause defense applicable to the section 6662(a) and (h) penalties resulting from valuation misstatements.

B. <u>Whether a Qualified Appraiser Made a Qualified Appraisal and Petitioners Made a Good-Faith Investigation of the Value of the Easement</u>

The reasonable cause exception does not apply in the case of a substantial or gross valuation overstatement with respect to property for which a charitable contribution deduction was claimed under section 170 unless the claimed value of the property was based on a "qualified appraisal" by a "qualified appraiser" and the taxpayer made a good faith investigation of the value of the property.  Sec. 6664(c)(2).

1. <u>Whether Mr. Miller Was a Qualified Appraiser</u>

Respondent claims that Mr. Miller is not a qualified appraiser because he was referred to Mr. McGrath by NAT and because he allegedly did not have experience valuing facade easements.[29]  Section 1.170A-13(c)(5)(ii), Income Tax Regs., states that "An individual is not a qualified appraiser with respect to a particular donation

---

[29]Respondent has not otherwise alleged that Mr. Miller did not meet the qualified appraiser requirements under sec. 1.170A-13(c)(5)(i), Income Tax Regs.

 * * * if the donor had knowledge of facts that would cause a reasonable person to expect the appraiser falsely to overstate the value of the donated property". Respondent argues NAT's referral of Miller Samuel violates this regulation.  We disagree.

Although NAT told Miller Samuel to send Mr. McGrath a proposal letter, there is no evidence that petitioners were or should have been aware of this fact. Even if they were or should have been aware of NAT's referral, we do not believe that fact standing alone would matter to a reasonable person, considering that even the NPS' 2003 Historic Preservation Easement Guide advised potential preservation easement donors to "Check with easement holding organizations  * * * for [qualified appraiser] recommendations."

It is not entirely clear why respondent questions Mr. Miller's qualifications. Respondent has not alleged that Mr. Miller failed to include his qualifications in the appraisal or failed to sign a declaration stating that his qualifications as described in the appraisal qualify him to make appraisals of the type of property being valued.  It appears respondent is attempting to use Mr. Miller's alleged lack of experience valuing facade easements as additional evidence that he would overstate the value of the facade easement at NAT's request (i.e., that NAT wanted Mr. Miller to appraise the property because he did not know what he was doing and would be a mere

puppet NAT could use to obtain a higher appraisal valuation). We reject these insinuations on two grounds.

First, even if we assume respondent's allegation that Mr. Miller had no experience valuing facade easements is true, we believe Mr. Miller had the qualifications necessary to properly research and value the Cobblestone facade easement. Mr. Miller was president, chief executive officer, and cofounder of Miller Samuel. He is also a licensed real estate appraiser in New York and a cofounder and managing principal of Miller Cicero, LLC, which provides commercial real estate valuation services.

Second, section 1.170A-13(c)(5)(ii), Income Tax Regs., requires that a donor have knowledge of facts that would cause a reasonable person to expect the appraiser to falsely overstate the value of the donated property. The evidence does not suggest that petitioners were aware of Mr. Miller's lack of experience valuing facade easements or that such awareness would cause a reasonable person to believe Mr. Miller would falsely overstate the value of the facade easement. Indeed, we believe that on the basis of Mr. Miller's qualifications and background, a reasonable person would not believe that Mr. Miller would falsely overstate the value of the facade easement.

For the reasons stated above, we find Mr. Miller was a qualified appraiser.

## 2.  Whether Mr. Miller's Appraisal Was a Qualified Appraisal

Section 1.170A-13(c)(3)(i) and (ii), Income Tax Regs., specifically requires that a "qualified appraisal":

(1)  be made not earlier than 60 days before the date of the contribution nor later than the due date of the return, including extensions, on which a deduction is first claimed or reported;

(2)  be prepared, signed, and dated by a qualified appraiser;

(3)  contain the name, address, identifying number, and qualifications of the qualified appraiser and, if the qualified appraiser is acting in his or her capacity as a partner in a partnership, an employee, or an independent contractor engaged by a person other than the donor, the name, address, and taxpayer identification number of the partnership or the person who employs or engages the qualified appraiser;

(4)  contain a statement that it was prepared for income tax purposes;

(5)  contain a description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was contributed;

(6) include the terms of any agreement of understanding entered into or expected to be entered into by or on behalf of the donor or donee that relates to the

use, sale, or other disposition of the property, including an agreement that restricts temporarily or permanently a donee's right to dispose of the property;

(7) show the date on which the property was contributed;

(8) show the fair market value of the property on the date of contribution;

(9) show the method of valuation and the specific bases for the valuation; and

(10) show the date on which the appraisal was made.

In Bond v. Commissioner, 100 T.C. at 41, this Court considered whether certain aspects of the above-referenced regulations were mandatory or directory and whether the taxpayer in that case had substantially complied with the regulations so as to be entitled to a charitable contribution deduction. We found the requirements to be directory rather than mandatory and found the taxpayer to have substantially complied with the qualified appraisal requirements because substantially all of the information required had been provided, except the qualifications of the appraiser on the Form 8283 attached to the return.

In Hewitt v. Commissioner, 109 T.C. 258 (1997), aff'd without published opinion, 166 F.3d 332 (4th Cir. 1998), the taxpayers claimed a charitable contribution deduction for a donation of shares of a stock that was not publicly traded. The taxpayers, however, had not obtained qualified appraisals before filing

their returns for the years at issue. The IRS disallowed portions of the deductions because of the lack of qualified appraisals. The taxpayers countered that they had substantially complied with the appraisal requirements and attempted to rely on Bond. We rejected the taxpayers' argument because the taxpayers had not provided any of the information required by section 170 and the regulations thereunder.

Taken together, Bond and Hewitt "provide a standard by which we can consider whether petitioners provided sufficient information to permit respondent to evaluate their reported contributions, as intended by Congress." Smith v. Commissioner, T.C. Memo. 2007-368.

Respondent argues that Mr. Miller's appraisal is not a qualified appraisal as defined in section 1.170A-13(c)(3), Income Tax Regs., because it: (1) fails to adequately describe the property contributed; (2) does not include a description of the terms of the use, sale, or other disposition of the property contributed; (3) does not provide the date of the contribution; (4) does not include a statement that the appraisal was prepared for income tax purposes; (5) does not disclose Mr. Miller's relationship with NAT; (6) fails to accurately identify the method of valuation used to determine the fair market value of the facade easement or to adequately describe

the specific basis for valuation; and (7) does not contain the appraised fair market value of the property on the date of contribution.

Petitioners argue that the appraisal meets the requirements of a qualified appraisal and that even if it does not, petitioners have substantially complied with those requirements. We agree with petitioners that the appraisal substantially complied with the regulations. We address each of respondent's assertions below.

Respondent asserts that the appraisal fails to adequately describe the property contributed because it focuses on Cobblestone itself rather than the facade easement donated. We disagree. The appraisal thoroughly describes Cobblestone and contains a lengthy discussion of historic preservation easements. We find it is clear from the appraisal as a whole that a historic preservation easement is being contributed and that the appraisal describes this easement.

Respondent asserts that the appraisal does not include a description of the terms of the use, sale, or other disposition of the property contributed because it did not contain an exact description of the restrictions in the facade easement. We disagree. The easement restrictions are described as: (1) prohibiting demolition; (2) limiting construction and development without NAT approval; (3) prohibiting changes to the exterior without NAT review and approval; (4) requiring

preservation maintenance; and (5) requiring periodic inspection of the exterior. We find this description adequate.

Respondent asserts that the appraisal does not provide the date of the contribution. However, we have found this requirement to be satisfied when taxpayers include the dates on their Form 8283 attached to their tax returns. See Simmons v. Commissioner, T.C. Memo. 2009-208. Petitioners did include the date of donation on their Forms 8283. We find this requirement was satisfied.

Respondent asserts that the appraisal does not include a statement that the appraisal was prepared for income tax purposes. We agree, however, the appraisal does state:

> It is our understanding that the appraisal will be used by the individual units [sic] owners within the condominium association in connection with a donation of the historic facade preservation easement to the National Architectural Trust (NAT), a "qualified" organization under Section 170(h) under the Internal Revenue Code. Therefore, the intended users are the property owner, the donee organization (NAT) and the Internal Revenue Service (IRS).

We have previously found such statements satisfy the requirement that an appraisal include a statement that the appraisal was prepared for income tax purposes. See id.

Respondent asserts that the appraisal does not disclose Mr. Miller's relationship with NAT and therefore failed to identify parties employing or

engaging him other than the donor. However, Mr. Miller was not employed or engaged by NAT. All Mr. Miller's fees were paid by the Cobblestone unit owners who were donating the easement, and Miller Samuel was chosen for the appraisal by the Cobblestone board. Although Mr. Miller did have some contact with NAT, we do not believe it rose to the level of an engagement as contemplated by the regulations.

Respondent asserts that the appraisal fails to accurately identify the method of valuation used to determine the fair market value of the facade easement or to adequately describe the specific basis for valuation. Respondent claims Mr. Miller's appraisal does not satisfy these requirements because it mechanically applied a percentage to the fair market value of Cobblestone to determine the reduction in Cobblestone's fair market value resulting from the facade easement donation. Respondent cites Scheidelman v. Commissioner, T.C. Memo. 2010-151, in support of his argument. In Scheidelman we stated that "the application of a percentage to the fair market value before conveyance of the facade easement, without explanation, cannot constitute a method of valuation as contemplated under section 1.170A-13(c)(3)(ii), Income Tax Regs."

We disagree with respondent. Mr. Miller's appraisal clearly identified the method of valuation as the market data analysis approach. In addition, the appraisal

did not mechanically apply a percentage reduction to the fair market value of Cobblestone. Instead, as in Simmons,[30] the appraisal recognized an IRS accepted diminution in value between 10% and 15% and then applied the specific facts of the case. Mr. Miller's appraisal considered that in a "more heavily regulated market like Manhattan, the lower end of the range is more appropriate since the market value impact of this modification of the bundle of rights on value would likely be less than a minimally regulated market." Mr. Miller's appraisal also recognized that three sides of Cobblestone faced the street (as opposed to the usual one) and that Cobblestone would lose the ability to advertise on the east facade as it had done in the past. After considering these facts together, the appraisal concluded that the facade easement would cause a 12% reduction in Cobblestone's fair market value. We therefore find Mr. Miller's appraisal adequately described the specific basis for valuation.

Finally, respondent asserts that the appraisal does not contain the appraised fair market value of the property on the date of contribution. Rather, the appraisal

---

[30]The Court of Appeals for the D.C. Circuit noted that the appraiser in that case "had relied upon an article prepared by Mark Primoli, an IRS employee, which stated that 'Internal Revenue Service Engineers have concluded that the proper valuation of a facade easement should range from approximately 10% to 15% of the value of the property.'" The Commissioner argued that the appraiser arbitrarily picked a percentage between 10 and 15. Commissioner v. Simmons, 646 F.3d 6, 11 (D.C. Cir. 2011), aff'g T.C. Memo. 2009-208.

valuation is given "as of" December 28, 2003, one day before the easement was donated.  Although respondent is correct, and there was not strict compliance with the regulations, this violation is a minor one.  We find this violation standing alone is not substantial.

We find that even though the appraisal did not strictly comply with all regulatory requirements, it substantially complied with them and is therefore a qualified appraisal.  See Bond v. Commissioner, 100 T.C. at 41.

### 3. Whether Petitioners Made a Good-Faith Investigation of the Value of the Facade Easement

We have previously held that when taxpayers show they reasonably and in good faith rely on an appraisal report for purposes of satisfying the general reasonable cause and good faith requirement of section 6664(c)(1), such reliance may also satisfy the good-faith investigation requirement of section 6664(c)(2)(B).[31]

---

[31]In Evans v. Commissioner, T.C. Memo. 2010-207 n.16, we stated:

petitioners have satisfied the general reasonable cause and good faith requirement of sec. 6664(c)(1)(B) by showing that they had reasonably and in good faith relied on Messrs. Wood and Keegan, whom they had commissioned to conduct an appraisal of the facade easements.  In doing so, petitioners had axiomatically caused to be made, on their behalf and in good faith, an investigation of the value of the contributed property.  Thus, in petitioners' case, the good faith investigation

(continued...)

For the reasons stated supra pp. 76-77 regarding petitioners' good-faith reliance on Mr. Miller's appraisal, we find that petitioners made a good-faith investigation of the value of the facade easement contributed to NAT.

C. Section 6664(c) Conclusion

On the basis of the analysis above, we have found that petitioners meet the reasonable cause defense of section 6664(c)(1). Petitioners have also shown that the claimed value of the facade easement was based on a "qualified appraisal" by a "qualified appraiser" and that petitioners made a good-faith investigation of the value of the facade easement as required by section 6664(c)(2). As a result, we conclude that petitioners are not liable for the accuracy-related penalties under section 6662.

V. Conclusion

We find petitioners improperly claimed charitable contribution deductions resulting from the donation of the facade easement to NAT. Further, we find the Dunlaps, the Smiths, and Rukan/Wheeler are entitled to charitable contribution

---

[31](...continued)
requirement of sec. 6664(c)(2)(B) is subsumed under the general reasonable cause and good faith requirement of sec. 6664(c)(1). Consequently, our analysis of petitioners' satisfaction of the requirements of sec. 6664(c)(1) extends to and includes the good faith investigation requirement of sec. 6664(c)(2)(B).

deductions resulting from cash contributions they made to NAT.  Finally, we find petitioners are not liable for accuracy-related penalties under section 6662.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.